First case is number 23-1843 United States v. Deontay Moore. Fossil. May it please the court, Stacey Fossil on behalf of Appellant Deontay Moore. I would like to reserve three minutes for rebuttal. Granted. In its decision in range, this court applied precisely the Second Amendment methodology that is required by Bruin. The court should apply that same mode of analysis in this case and compare each of the government's proposed analogs to 922 G1's permanent ban on firearm possession by someone with past offenses like Mr. Moore's. The government here relies largely on the same history and tradition as it did in range. And this court correctly rejected each of the government's proposed analogs for 922 G1 because they did not similarly burden the right to bear arms or not similarly justified. The reasons this court gave for rejecting those analogs apply equally here. And the necessary conclusion is that 922 G1 is unconstitutional as applied to Mr. Moore. I was going to start with the analogs that the government sites relies most heavily on, I think, were the founding era forfeiture laws. Would you agree? Yes, Your Honor, I'd say the founding era forfeiture laws, the laws disarming loyalists and the seizure of firearms from people who are actively using them to spread terror, I take it to be those to be the government's analogs that it relies on most heavily. All right. And the forfeiture laws, as I understand it, correct me if I'm wrong, stripped convicts of all possessions, including weapons and prevented them from reacquiring them until after their sentence was completed. A few responses to that, Your Honor. I think first, there are different types of forfeiture laws. So to the extent that we're talking about estate forfeiture, I think those were on shaky ground at the founding. And I think the range court correctly rejected those analogs because the greater does not include the lesser. And the fact that and forfeiture is just... Well, but remember range was about a permanent disability, permanent disarmament. And I'm just asking you to focus on the temporary disarmament while the sentence is in effect. Is it your argument that Mr. Moore's sentence was not in effect? Or is it your argument that it was in effect, but he still had a right to keep and bear arms while under the sentence? Our argument is that his prison sentence is not in effect. That's a major difference, but maybe not so, right? He was still serving a sentence, was he not? A criminal sentence. He was serving a supervised release. I know. That's not my question. We know that. The question is, was supervised release part of this criminal sentence? I think it was, Your Honor, but I don't think... In fact, that's beyond dispute, isn't it? Supervised release is a part of a federal criminal sentence. Yes, Your Honor. We do think that that's the relevant question here for a couple of reasons. First... That's fine. I find that curious, though, that while we couldn't immediately agree, it doesn't really matter if it's not relevant, why supervised release is, in fact, a part of a federal sentence. Yes, Your Honor. Apologies if I misunderstood your question. Yes, the supervised release sentence is part of a criminal sentence. And our argument is that it's not relevant here because the charge is 922 G1. Why is it not at all relevant? If it's part of a federal sentence, Mr. Moore was still in custody, was he not? He wasn't in prison, but he was still in custody. He was still subject to certain restrictions on his personal liberty. No, Your Honor. We don't think he was in custody. Supervised release is not a custodial sentence, and we do think that's an important difference if the court is looking at the historical analogs as preventing someone who was serving a custodial sentence. Is someone who is subject to pretrial release, but subject for the prosecution, subject to custody, in custody, I should say? I don't think so, Your Honor. I think it would depend on whether it is considered a BOP custodial type sentence, and supervised release is not. And we would also like to note that Mr. Moore did, in fact, receive a conviction for violating his conditions of supervised release and hasn't appealed that. I would give up on this and certainly not monopolize this, but I would ask if you might take a look at Kenneth versus Cunningham, a 1963 case in the Supreme Court. It's my recollection that the significant restraints on liberty are sufficient to suggest that a person is in custody. I realize we didn't have supervisors, but we had parole substitutes. My understanding, Your Honor, of the cases, and I'll look at that specific case, but of the cases that talk about restrictions on liberty during supervised release are relying on usually, for example, the Fourth Amendment, where there is an implicit balance, an express balancing of government interests and individual interests and a concept of reasonableness that simply doesn't apply in the unqualified command in the Second Amendment. And so I take it there are two arguments the government can make. One, that Mr. Moore was not a person because of his supervised release status. I don't hear them to be making that argument. Not one of the people because of his supervised release status. And I don't hear them to be the people. And so then the question is, can this particular encroachment on his Second Amendment right, is that consistent with the history and tradition? And I don't think here the analogs that the government points to in the supervised release context can get them there. One, and I'll take each of those in turn, they rely on the forfeiture laws. But again, forfeiting someone's instrumental crime or even someone's entire estate is different than a forward-looking ban on future future possession. And I think those forfeiture laws are also not comparably justified. They often states that they existed at the founding were... Let's look at the forfeiture law analogs. So when would you say that is right? Are you saying that once he left the prison setting, that his right to possess a firearm per your challenge began? Yes, Your Honor, with the caveat that perhaps in another case, if the government for Congress were, for example, to enact a statute that said, we prohibit anyone who is on supervised release from having a firearm, then there could be a historical analysis in that case. But we simply don't think that is this case. And even if we get that historical analysis, we don't think government has any analogs. Did the government properly raise the supervised release question? It did not. It did not. It did not raise the supervised release question in district court, Your Honor. And we've been litigating this issue for years. And the government's position in district court was that the only relevant thing was the existence of the prior felony conviction. Does that preclude us from considering it under the theory that we can affirm on any basis that appears in the record? I acknowledge, Your Honor, yes, that you can affirm on any basis that appears in the record. So the fact that they didn't raise it may not be of art for us to consider. I believe that is correct, Your Honor. Although I don't think they have given a good reason to consider it given the type of in-depth historical analysis that's required in these cases and that making this for the first time on appeal. Do you think that we should go through the entire forfeiture, all the forfeiture steps, and at the final one not see this as a question of such import that we should not regard it as forfeiture? Your Honor, it may be a question of import. I just don't think that this is the correct case to decide it. But again, I'm happy if Your Honor would like to reach that question. I'm happy to address the analogs. I don't think that the government has analogs for supervised release. You're clearly correct about that as a factual matter. But the Bruin opinion said it doesn't have to be a twin. And I take the reason for that to be circumstances change. We didn't have infrared technology at the founding. But as you know from Kylo, the Fourth Amendment applies to that technology. And because supervised release wasn't around at the founding, shouldn't we be looking at it as whether or not supervised release is part of the sentence? And isn't that a close enough analogy to satisfy Bruin? I do think that we can use analogies and draw principles. But I think Bruin provides some helpful guideposts on how to do that. In Bruin, the law at issue could have been generally characterized, as were the founding era laws, as a regulation of public carry of firearms. But the court didn't sort of say that. They said, no, we look at E particular analog. This one didn't prohibit concealed carry. This one only was about intent to carry in a way to cause terror. With certain types of people, I think we're dealing with a who question, not a where question here, right? We're dealing with whether this category of individual, as you pointed out, there were prohibitions on Catholics and Loyalists from having firearms. Of course, those would be unconstitutional today for other reasons. But you don't really have an equal protection defense that would apply in those types of cases here. You've got a category of person, i.e. somebody who is still laboring under the disability of a criminal sentence. I think you've agreed to that, correct? Yes. The argument, as I understand it, you're making is that even though he's laboring under the disability of a criminal sentence, the fact that he has physically exited the cell means that he has a right to keep and bear arms. Is that the crux of your argument? Yes, Your Honor. And we don't think that this is a who question because we think that Mr. Moore is part of the people. We agree that he's of the people. But I think we can also agree, perhaps you don't, that some members of the people can be disabled, at least temporarily, from keeping and bearing arms if under ruin, there's an historical analog to justify. Yes, Your Honor. And so then that's where I think we have to look at the historical analogs to supervise release. And I think that defining it as a criminal sentence is simply too broad when all of those historical justifications were about sentences of imprisonment. And the why for forfeiture was something about someone who, the idea that at the founding, someone who committed a crime was not entitled to their property anymore. When someone's on supervised release, they're able to get there to be put together. Let me ask you what perhaps is a good question. Are you arguing that Moore is not dangerous? Yes, Your Honor, under any relevant meaning of dangerousness that can be derived from the analogs. I don't think he's dangerous as a criminal. Certainly not in any way that we can look at the government's proposed analogs and derive a principle. I think that the dangerousness principle is unworkable and really has no principled limit. Maybe some of the Supreme Court will agree with you on that. But as a final question, is it then, is it your argument that the government cannot disarm dangerous felons? Your Honor, I think that is the most faithful application of the Bruin test. Your answer was what? I think that is the most faithful application of the Bruin test. I acknowledge that in some cases they can disarm dangerous felons. I think the most faithful application of the Bruin test is that in this case, the government has not shown that they can disarm. Would you concede that the government should be able to disarm a drug dealer who has been convicted previously of illegally possessing a firearm? No, Your Honor. And I would start with the government's analogs. And I take it that their best analogs are the laws that disarmed loyalists and the laws that seized a firearm for someone who was actually using it in a way that threatened violence. And if any principle can be gained from that, it may be that it still is a jump to say permanent disarmament of someone with a past violent crime. But then I think it simply sweeps far too far to also sweep in people with non-violent crimes like Mr. Moore's who we. You're saying drug dealing is not a violent crime? Yes, Your Honor, I am. And I. Understanding all of the evidence, shootings, killings in the delivery of drugs. I think, Your Honor, when we dig in, there really isn't that evidence. I think it's telling that the government only cites one study and that exact same study would also have supported disarming Mr. Moore. There's only, or Mr. Range. There's a three percent difference in violent recidivism risk between someone with a drug felony and a fraud felony. And so I or a fraud crime. And so I think we really have to dig deeper than that. We study in our case, in our brief that has a different result in a much lower recidivism risk. And I think the danger of this is that it illustrates is that we're back in the world of essentially means and balancing, maybe even rational basis where we're deferring to the legislature's ability to label a category dangerous and then just a huge swath of people. Thank you. Mr. Glazer. May it please the court, William Glass from the United States. Consistent with this court's decision in range, Congress can prohibit firearm possession by those who have committed serious felonies and those who are dangerous based on his state and federal convictions for both drug trafficking and firearm possession by a felon. Mr. Moore had committed serious felonies and he was dangerous. And therefore he cannot show that section 922 G1 is unconstitutional as applied to him or on its face. It's the basis upon which you say. So your honor, there's a few different things we would point to. First of all, I think multiple members of this court, including, for example, panel, this court in part concluded that drug trafficking is a dangerous crime, not that it necessarily requires violence in every instance, but as multiple circuits have observed, including this one, there's nearly always a risk of violence erupting when drug trafficking occurs. Well, you have a problem with that argument under our circuit president, because in binder up my concurrence made that point and it was not accepted by a majority of your honor. I don't think that's actually the import of a decision of the other judges in vendor up. They weren't necessarily saying that dangerous felons can't be disarmed. They were saying that, in fact, it's a broader category that focus on dangerousness is too narrow. I think that's clear from the subsequent panel decision and even just if you look closely at the other judge's opinions in vendor up, they weren't saying that dangerous felons cannot be disarmed. They're just saying that more than they didn't say all dangerous felons can be disarmed either. And in range, we didn't say that dangerous felons can be disarmed. What we said was Mr. Range, the 922 G1 as applied to him was unconstitutional because of the nature of his crime. I'll be at a non-dangerous crime, but we didn't hold the inverse is what I'm saying. Sure. I agree that's correct. I think that this court would be breaking new ground in this case. I do that when the supervised release path seems a lot more straightforward or do you not have confidence in your historical in a lot? Your Honor, so I would be happy for the court to decide this case based on the supervised release. I think the problem with that approach though is that then the next time that we have someone with nearly identical prior felonies, we're right back again before this court trying to sort of struggling to discern what standard to apply even for someone who's not on supervised release. Exactly. Well, that's the next case. I would like to think this court is very disciplined in trying to decide this case, not the next case. Absolutely, Your Honor. In fact, it seems to me there's a long history in the common law of that sort of case-by-case resolution. Sure. And so, but I think case-by-case resolution, I think the court could just as easily say someone like Mr. Moore is clearly dangerous, however you conceive of the dangers in the standard. And so, I think that's just as straightforward in a way. Just as straightforward. And again, to return to Judge Fischer's question, so we beyond the, and I'd like to talk about supervised release too, but to return to Judge Fischer's question just for a moment, so beyond the case law, for example, Barton, we cite the Bureau of Justice statistics study indicating a high re-arrest rate and recidivism rate for those who have engaged not simply in drug trafficking, but those who've been arrested for any drug offense. And if I can just briefly respond to Ms. Fossil's reference to the other study in their brief, so they cite this in their reply brief at page 21, and that study indicated a far lower recidivism rate, but as we've explained elsewhere, specifically in our reply brief in the Quails and Harper appeals currently pending before the Third Circuit, that was just a mistaken understanding. That law review article cited another law review article that misunderstood the study, and in fact, that study did not involve those convicted. I really need to get into the granularity of what one law review said as opposed to another. Your Honor. I have been asked, in fact, just a few moments ago, to return to the supervised release question. I'm happy to go there, Your Honor. So as the... In view of that, let me ask you this starting point anyway. Is the fact that Mr. Moore was under supervised release at the time of this offense affecting whether or not he's one of the people? So, Your Honor, I think that the government would make that argument perhaps in another essentially foreclosed by a range, because if someone is not removed from the people by virtue of a felony conviction, then it's very difficult to argue that the fact that they continue to serve their felonies, their felon sentence, that part of their sentence that they are not part of the people. So we've certainly argued even into the Supreme Court in our cert petition and range that those who have been convicted are not part of people, but I don't think that there's room for us to advance that argument in this court. Are people who are in the country illegally part of the people? No, Your Honor. Our position is that they are not, and the 8th Circuit has agreed with us. But they have due process rights. Absolutely, that's correct. They're persons, but not part of the phrase of art, the people. Yes, Your Honor. The term of art, the people, purposes of the Second Amendment where we actually have drawn a dividing line between the Second Amendment... What about the Fourth? Is there a difference between the Second and the Fourth? Yes, Your Honor, there is. And we think that there's a difference and that the Fourth Amendment does apply to those who are present in the country illegally, although not obviously at the border. What's the textual basis for the distinction between the use of the people in the Second and the Fourth Amendment? So, Your Honor, I think... Or is it just a case law gloss? Your Honor, I think that the textual basis is rooted in history. And the reason is that as Bruin and Heller explained, the Second Amendment incorporated a right, recognized a right that existed for a long time. And so our view is that the right that had existed for a long time was not something that just applied to all members of a given populace, but in fact, could be limited to those who are law-abiding and responsible and who are actually part of the civic community. Okay. I take it from what you said. You'd like to see us decide this case on dangerousness aspect of a drug dealer who had a prior firearms conviction. But if we do that, doesn't that require us to take into consideration some of the circumstances surrounding Moore actually possessing this weapon and may not this raise some questions that Moore has some self-defense rights that others... Your Honor, I don't think that this Court actually needs to... I think this Court could conclude. We would like this Court to conclude, but you might disagree that based on his prior convictions and the seriousness of those offenses, regardless of the circumstances of his possession in this case, he can't possess. But I'm happy to address the self-defense claim here. And I urge the Court, if you haven't already... You're saying regardless of the circumstances, he can't possess? Yes, Your Honor. So let's take... These facts are perhaps... I'll call them gray. All right. What if it was more clear? What if instead of the burglars trying to burglarize the car, they were actually in the house? So, Your Honor, I think if we take... Does that change Moore's status on this constitutional challenge? Your Honor, this Court has recognized a necessity or justification defense in Section 922 G1, and most circuits have. And if he could satisfy the requirements for a necessity or justification defense, including that he wasn't the one who initiated the use of a weapon, that he was the one who reasonably feared for his life, he may be able to satisfy that statutory defense. But as a constitutional matter, we don't think that it's significant. Well, as I read the brief for the appellant, they almost went there. And of course, Ms. Fussell can respond to that, but they almost seemed to be suggesting that this was, or certainly that it bordered on a defense of the home situation. And Your Honor, we think... I agree that they have certainly... If the Court hasn't already, I would urge you to watch the video that the government... It won an Academy Award, but then it was only a short. Right. And I think if you're watching that video, you can see that the two burglars, if you will, car burglars, that they're not walking, they're coming from the direction of Mr. Morehouse. They were fleeing from the car at the time. You can see a muzzle flash of at least the final shot. But even before then, you can see them coming from a different part of the parking lot, nowhere near the apartment. And they're in a car. He admits he doesn't know whether they're armed. He was just concerned that they were armed and he shoots at them as they're fleeing. So I don't think there's under those facts... I didn't want to make too big a point of this. I only wanted to suggest that I think there was an attempt by the appellant here to suggest such a thing. That is correct. And I don't think that Mr. More could satisfy a self-defense or necessity defense. What if he could? Your Honor, even if he could, I think as a constitutional matter, that wouldn't matter. So he would have a statutory defense against 922 G1. But let's take, for example, the quintessential example of a murderer who's been released from prison. Our view is that under the Second Amendment, the murderer, the arsonist, the they can be constitutionally prohibited from possessing a firearm in the home for purposes of self-defense. We recognize self-defense is a quintessential. It is the core of the Second Amendment, right? Heller has said that. But the government's view is if you commit a crime that's serious enough, you can be forever disarmed. That's correct. Regardless of where you are. Absolutely. That's our position. There's an interesting point made in your friend on the other side's brief, where they cite founding-era militia laws that required all able-bodied males to keep and bear arms. Those laws had exclusions, but I didn't see any exclusion for felons. Could you address that? Your Honor, I agree. There were not, none of the militia laws had exclusions for felons. I think there may be a few reasons for that, including the fact that felons not all were, but many felons could be executed. They could forfeit their entire estate, in which case they'd be very hard-pressed to acquire the necessary arms. In fact, if you look at the history, it was a long-standing problem that militia members who were supposed to have arms actually didn't have arms. It seemed to be the first unfunded mandate. That was the first thing to read about. I remember learning about this, that the government, there were laws, I think, in every colony, in every state saying, thou shalt have arms in proper working order with Flint. With your obligation as a citizen. Right. Right. The government did not help you pay for that. That's correct, Your Honor. There's been some fairly extensive research into the fact that it was a long-standing problem that a quarter or up to a half of the population in certain I just don't think that... They weren't all Quakers. That's correct. They weren't all Quakers. I think especially... They all needed to eat, and a lot of them had their weapons for that. But some weapons that were possessed for personal reasons, such as hunting, didn't qualify as militia weapons. Again, I just don't think that we can draw too much from the fact that there wasn't a specific felon carve-out to those militia requirements, especially when considered against the backdrop of the other historical analogs that we point to, including the English tradition of disarming those who were dangerous, that was carried over into the colonies, the statute of Northampton that was carried over into specific colonial statutes that allowed the disarming of those who went around to the terror of the people. Would you address Ms. Fazell's argument that things changed for Mr. Moore in terms of his Second Amendment rights when he left carceral status? So, Your Honor, we do not... We all agree, and she did agree when she was standing up there, that he's laboring under the disability when they sent him. But the argument is once he was no longer incarcerated, things changed. What's your argument in response? So, Your Honor, I do think that there are differences between the liberty restrictions that can be imposed in the incarceration setting and those that cannot be. But we would point to, for example, the Ninth Circuit's decision in Perez-Garcia involving pre-trial release. And the Ninth Circuit concluded that the firearm prohibition under the pre-trial release statute was constitutional for the reason that the person could have been detained. They could have actually remained in a custodial setting. And the fact that they're released, there can be limitations placed on a number of aspects of their life. They could be required to wear an ankle monitor, for example, and can be prohibited from possessing a firearm. We would argue that the same is true of someone who is on supervised release. It is, returning to Judge Smith's question in the earlier argument, for purposes of Section 2255, someone who is on supervised release is treated as being in custody. And the Supreme Court's decision, the 2000 decision in Johnson, sort of reaffirmed in Haymond more recently, recognized that supervised release is part of the underlying original sentence. So there's no question that he was under a federal sentence at the time that he possessed the firearm here. Can you help me, please, seriously with this? What the doctrine such as it is so far is, as it applies to the Bruin requirement that the Second Amendment protects a person and his proposed course of conduct. I'm not sure what is intended by that or what is meant by that. You argue that Moore doesn't have a lawful purpose in possessing a firearm here. Of what relevance is an individual's purpose in the Second Amendment analysis we must go through here? Does the Bruin test require us to analyze purpose? Your Honor, I think it does, at least in certain situations. So I think the most straightforward example of this is, for example, there have been challenges to Section 924C, those who are using, and I see my time has expired if I may answer the question, those who are actually using or possessing a firearm in furtherance of a crime of violence or drug trafficking crime. And in that case, we think that the absence of a lawful purpose is just dispositive and someone cannot say, I have a right to use a firearm to commit a crime. I think it's more difficult in the context of someone who's a felon in possession who may or may not be using it for the lawful purpose of self-defense. Obviously, we think it's not lawful even, he can't possess a firearm even for that lawful purpose, or is using it for some unlawful purpose such as drug distribution. I think if there's adequate evidence that the firearm was being possessed in connection with an unlawful purpose of burglary, drug distribution, etc., that would be sufficient to demonstrate under Bruin and Heller that it's not a lawful purpose. All right. Thank you, Mr. Glaxer. We'll hear rebuttal, Ms. Fossil. I wanted to start by pointing out a risk of holding that 922 G1 is constitutional as applied to felons serving supervised release sentences. I think there's a danger there of rewriting the statute in a way that Congress didn't intend. And I think that's especially apparent here where there is a statute that governs violations of supervised release conditions, and there's an entirely different punishment that those individuals are subject to, and a much steeper punishment for 922 G1. So it may be that Congress can write that statute, it may apply to misdemeanants and felons, may have a different type of punishment, but I don't think that in this as-applied challenge where supervised release is not an element of 922 G1, it makes sense to resolve that question in this case. You went a little fast for me on that. Could you unpack that? Because as I understood what you were arguing, because there's a statute that allows a supervised releasee to be charged with violating supervised release, that somehow suggests that someone on supervised release has a right to keep and bear arms? Because of its interaction with 922 G1? I'm just not following you. I acknowledge, Your Honor, that there's not much guidance on how an as-applied challenge should work. But what I'm suggesting is that when we are figuring out a way that a statute can apply to someone in a way that's sort of carving up the statute beyond what it actually says. So in this case, Mr. Moore was indicted for 922 G1, that's the conviction he's appealing. And if we were to say, well, he can be convicted under 922 G1 because he was on supervised release, that to me feels like a different statute. I see. So you're saying that the supervised release statute shouldn't be leveraged to convict him of 922 G1? Correct, Your Honor. I'm just not sure it's being leveraged. Isn't there a historical analog that someone who was in jail could not possess a weapon? I do think that's a historical analog. So if we conclude that supervised release comes within that context of sentence, we wouldn't be creating an exception for 922 G1? I still think there would be the problem that you would be saying someone on supervised release can be convicted of 922 G1 when supervised release doesn't have to be indicted. There's no notice. It's part of the sentence. It's possible that you could have supervised release during the week and return to jail on weekends. Yes. And we're simply saying that the correct forum for that challenge would be someone who has violated their conditions of supervised release and is appealing that particular sentence. But to say that 922 G1 can apply to someone on supervised release when that doesn't have to be in the indictment, it's not an element of the offense. And there's not a there's a specific punishment for just for the fact of being a felon. We think it goes too far and risks sort of rewriting the statute in a way Congress may not have intended. And just again to address the I think it's not enough to say is a criminal sentence like an imprisonment sentence. I think we have to look at how and why there was the burden on having a firearm during a prison sentence. And I don't think those look anything like a forward looking prohibition for preventing societal violence. The way that founding era governments did that was things like seizing firearms when someone was carrying them in a in an improper way. That seems to suggest that supervised release should be treated just like every other member of the public. Again, Your Honor, I can see that and I acknowledge that for Fourth Amendment purposes, that's simply that's certainly not true. And that there are some weighing and some of the other constitutional intrusion in First Amendment and First Amendment where there's means and balancing, Your Honor. But I think for the purposes of the Second Amendment, until the government points to an analog, that is that is true. And I don't think they've pointed to a sufficient analog that burdened someone who had already committed a crime that past crime based on a forward looking prevention of handgun violence. It was either forfeiture because that was sort of societal. You don't get property anymore or you can't have firearms in prison because of the practical difficulties of that. And again, those can all be explored, we think, in another case, Your Honor. Thank you. Thank you very much to both counsel. Appreciate the briefing and the argument. We'll take the matter under advice.